## THE MANHATTAN.

### (District Court, D. Maryland. November 28, 1921.)

### No. 833.

1. Shipping ⟶108—Measure of damages for breach of contract stated.

Libelant, an exporter of grain, contracted with respondent for cargo space on a designated steamship for 5,000 bushels of wheat from Baltimore to Hamburg, but before doing so, in accordance with the custom of the trade, contracted for the sale of the grain in Hamburg to arrive by such steamship. Respondent desired to substitute another vessel, but the Hamburg buyer refused to consent, except at a stated reduction in the price of the grain, and as respondent would not agree to stand the loss and refused to accept the shipment on the vessel named, libelant sold the grain in Baltimore and brought suit for breach of the contract. Held, that its damages recoverable were limited to the amount it would have lost if it had shipped by the other vessel and accepted the reduced price.

2. Customs and usages ⟶12(1)—Contract to carry grain to foreign port construed with reference to known custom of the trade.

Where a shipowner, contracting to carry a cargo of grain to a foreign port, had knowledge of the custom of shippers of grain to contract in advance for sale of the cargo to arrive, it contracts with reference thereto, and on breach of its contract to carry is liable for the resulting loss to the shipper, arising from his failure to deliver under his contract of sale.

In Admiralty. Suit by Harry C. Jones against the steamship Manhattan. Decree for libelant.

Albert S. Gill and Edward M. Hammond, both of Baltimore, Md., for libelant.

Lord & Whip, of Baltimore, Md., for respondent.

ROSE, District Judge. [1] The libelant is asking damages for the breach by respondent of a contract to carry on the latter's steamship, Manhattan, 5,000 quarters of heavy grain from Baltimore to Hamburg. Both the making and breaking of the contract are admitted. All that is in dispute is the measure of damages. As the libel was originally filed, it appeared not to be so much in personam against the respondent, as in rem against the ship; but, as the grain had never been received by the Manhattan, the latter had not become liable. The parties have, however, agreed that the libel shall be treated as against the respondent, a British corporation, in personam, with a clause of foreign attachment, under which the ship was arrested.

There is little difference as to facts. The libelant is engaged, among

other things, in the purchase of grain in this country and in its sale abroad. It is the usual practice of it and all others engaged in a similar business in this port, before engaging transatlantic cargo space, to sell or to contract to sell the grain to some buyer on the other side. From this method of doing business, the libelant and the other Baltimore grain shippers seldom depart, and then only under rare and exceptional circumstances.

Two contracts for space are really involved—one for 3,000 quarters; the other for 2,000; but, as the circumstances concerning both are identical, they will be dealt with as if they were simply one for 5,000.

The steamship's brokers or agents offered to the libelant space on the Manhattan. The libelant asked if their proposition could not take the form of space for 5,000 quarters to Hamburg, for shipment during the latter half of April, the time during which the Manhattan was expected to sail, instead of being limited to that ship; but the libelant was informed that the respondent was unwilling to offer anything except space on that particular vessel. Thereupon the libelant cabled Hamburg, offering to sell 5,000 quarters of wheat for April shipment by the Manhattan, at .19½ guilders per 100 kilos. The offer was accepted by cable, the name of the steamer being repeated in the acceptance, and when the formal contracts were executed and arrived here, it was found that they also specifically provided that the shipment was to be by the Manhattan.

Not until the cablegram from Germany, accepting the proposition for the wheat was received, did the libelant close with the option for space and enter into the contract here sued on, which is dated March 23–24, 1921. About two weeks later the respondent told the libelant that it would like to substitute the steamer Maryland for the Manhattan; but the libelant said it could not agree to such change without the consent of the Hamburg buyer. The respondent asked libelant to cable, asking for buyer's permission, but buyers cabled back refusal. Again and again, from the 7th to the 14th of April, at the respondent's instance, the libelant cabled, renewing the request for substitution, and as often refusal came back. The respondent asked libelant's permission to get in direct communication with the German purchasers. The libelant readily consented; but, if respondent did so, its efforts were also fruitless.

On the 12th the respondent tendered the Maryland to the libelant, who refused to accept it. On the 16th the respondent notified the libelant that the Maryland would be ready to receive grain under the contract. The libelant adhered to its position, and notified the respondent that it would hold the latter for its loss; but it again cabled Hamburg, telling of the situation here. Then, on the 17th, the German buyer, which was really the German government, or the German Food Commission, acting for the government, cabled that it would agree to the substitution at a reduction of one guilder per 100 kilos in price which was equivalent to about $3,739.24 on the 5,000 quarters. The libelant, from time to time, submitted all the cablegrams it received to respondent, and the one offering to accept the substitution

at a reduction of one guilder per 100 kilos was among the rest. The respondent, however, said nothing, and the libelant doubtless accurately treated this silence as a refusal to make good the proposed sacrifice of a guilder per 100 kilos. On the 18th the libelant cabled Hamburg that it could not accept the proposed reduction, for fear of prejudicing its claim against the respondent, and notified the latter that the time for accepting the offer of reduction had passed, and that it would hold it for exemplary damages.

About this time the Manhattan arrived in Baltimore, and the libelant tendered to the respondent 5,000 quarters of wheat for it, which tender was refused. About this time the president of the libelant called up the general manager of the respondent's line in New York, and explained the situation in which the libelant was placed; but the reply was that it would cost the respondent more to send the Manhattan, than to pay any damages the libelant could get in court. The libelant notified the respondent that it would sell the wheat at or for its account and risk, and did so on the floor or the Baltimore Chamber of Commerce. It realized therefrom $10,689.23 less than would have been the net return, had the grain been carried by the Manhattan to Hamburg and delivered to the buyer. The cablegrams, which, at the request of the respondent, libelant paid for, cost $197.03. When the contracts were made, it had bought exchange to cover, and its loss thereon was $744.10, which, added to the other items already named, foots up $11,630.36, which represents the amount the libelant was out of pocket in consequence of respondent's breach of contract.

It is, however, not entitled to recover for any loss which it could have prevented. It might have accepted the proposition of the Hamburg buyer to ship the grain by the Maryland, at a guilder per 100 kilos below the original selling price. If it had done so, its loss would not have exceeded $3,739.24, plus the cost of cablegrams. It did not, because, as it told the Hamburg buyer, it feared to prejudice its claim against the respondent, but that was not, under the circumstances, a sufficient reason for sacrificing nearly $8,000 more by selling the grain in Baltimore. The libelant assumed that, if it sent the grain by the Maryland, it would waive its claim against the respondent for breach of contract. It could have protected itself from any such possibility by notifying the respondent that its forwarding the grain on a substituted steamer was not to affect its claim for the loss it had suffered by the change. If the respondent had refused to take the wheat under such terms, then the libelant might well have been justified in selling it here; but there is no hint in the record that respondent took any such position.

The most favorable rule of law for which libelant can contend measures its damage by the difference between what would have been obtained for the merchandise at the port of destination, if it had been shipped as the contract called for, and that realized at the time the shipment actually arrived. The libelant points out that, under the laws and regulations then existing in Germany, there was only one legal buyer of wheat, the German Food Commission, to which it had sold. True enough, but a responsible buyer had offered to take the

grain at a guilder per 100 kilos less than the original contract price. The fact that such buyer was the original purchaser made no difference.

The libelant, if it had shipped by the Maryland, could have obtained a price only one guilder per 100 kilos less than it would have secured, if the same merchandise had gone forward on the Manhattan, according to contract, and that, plus the cost of the cablegrams, would seem to be the true amount of recovery to which the libelant is entitled.

[2] The respondent claims that the libelant may not be awarded anything more than nominal damages, because it says that it offered to carry the grain on the Maryland at the same freight, and that it was not responsible for any special losses which the libelant incurred. The answer is that I find as a fact that the respondent perfectly well knew the custom of the Baltimore grain trade and contracted with reference to it. When it told libelant that it would sell space on the Manhattan, and not on a ship, it was aware that the libelant would necessarily have to contract in Hamburg for grain to arrive by the Manhattan, and that therefore the release of the German buyer and the resulting damage to the libelant would be the natural and proximate consequence of any failure of the grain to go forward by that vessel.

It follows that the libelant is entitled to a decree for $3,936.27.